UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America, | Case No. 21-cr-20 (ADM/DTS) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Devin Delbert Donald Blom (1) and Michelle Margaret Blom (2), | |
| Defendants. | |

---

Devin Blom and Michelle Blom are each charged with one count of conspiracy to distribute methamphetamine and one count of aiding and abetting possession with the intent to distribute methamphetamine. Indictment, Dkt. No. 1.[1] They brought four motions to suppress evidence and statements. Dkt. Nos. 40, 41, 49, 51. For the reasons discussed below, the Court recommends denying the motions to suppress evidence, dismissing as moot Michelle's motion to suppress statements, and granting Devin's motion to suppress his statement at the Meeker County Jail.

**I.   Michelle's Motion for Suppression of Confessions or Statements in the Nature of Confessions**

Michelle moves to suppress post-arrest statements she made about the cash in the purse she was carrying as she was being led to the police squad car to be transported

---

[1] Michelle and Devin Blom are now married. At the time of the events at issue, Michelle's name was Michelle Margaret Patzold. The name on the indictment was later corrected to read Blom instead of Patzold. *See* Order to Amend Indictment, Dkt. No. 24. For simplicity the Court will refer to them here as Michelle and Devin (the search warrant and application refer to them as Patzold and Blom, respectively).

to the Meeker County Jail on August 12, 2020. Dkt. No. 51.[2] The Government contends the statements are admissible but it will not be seeking to admit them at trial and thus her motion should be denied as moot. Gov't Post-Hrg. Br. 6 n.2, Dkt. No. 123. Accordingly, the Court recommends her motion to suppress statements be denied as moot.

## II.    Devin's Motion to Suppress Statements

Devin moves to suppress "statements regarding the cash found in his wife's purse and other statements" he made during a post-arrest interview at the Meeker County Jail on August 12, 2020. Dkt. No. 40.[3] He argues he immediately invoked his right to remain silent after being advised of his *Miranda* rights, but law enforcement officers nonetheless interrogated him for several minutes. *Id.* The Government contends that, after Devin declined to provide a *Mirandized* statement, he then voluntarily initiated conversation with law enforcement and did not clearly and unequivocally invoke his right to remain silent. Gov't Br. 5-7, Dkt. No. 66.

---

[2] Although her motion does not identify any specific "confessions or statements" she seeks to suppress, her post-hearing brief is clear that the statements at issue relate to her statements about the money in her purse. Def. Post-Hrg. Br. 2-3, Dkt. No. 117.

[3] He did not identify any "other statements" from the jail interview or further address the motion in his post-hearing brief. *See* Dkt. No. 118. There are no other statements on the audio recording of the jail interview other than a routine administrative-type conversation regarding forfeiture process and paperwork.

A.  **Findings of Fact**

The audio file of Devin's custodial interview at the Meeker County Jail is three minutes 5 seconds long. Gov't Ex. 6.[4] The Government's brief contains a transcription of part of the conversation.[5] It states:

| | |
|---|---|
| Agent Schutz: | [reads *Miranda* warning] Having these rights in mind do you wish to talk to me now? |
| Blom: | No. |
| Agent Schutz: | No? |
| Blom: | What are my charges? |
| Agent Schutz: | So your charges are Fifth Degree Possession, Fifth Degree Sales, and Fifth Degree Possession. |
| Agent Hudson: | First Degree. |
| Agent Schutz: | [some overlap] First Degree Possession, First Degree Sales, and Fifth Degree Possession. |
| Blom: | First Degree? How'd you get First Degree? |
| Agent Hudson: | Cause we went through the vehicles. |
| Blom: | Huh. |
| Agent Hudson: | Yeah. |
| Blom: | Okay. |
| Agent Hudson: | So, your DNA gonna be on there? |
| Blom: | No. |

---

[4] The audio file is not included on the exhibit list in the Hearing Minutes [Dkt. No. 107] because no party sought to admit it into the record at the motions hearing. It was separately provided to the Court and designated as Gov't Ex. 6.
[5] The Court has listened to the audio file. The transcription in the Government's brief is substantially accurate, with only very minor and immaterial differences between the audio and the written transcript.

3

| | |
|---|---|
| Agent Hudson: | You sure about that Devin? |
| Blom: | Yeah. |
| Agent Hudson: | Any idea why Shelly would have $71,000 in cash on her? |
| Blom: | Because she cashed money out of her 401k? |
| Agent Hudson: | Is that the only reason you can think of? |
| Blom: | Is that your only question? |
| Agent Hudson: | I mean it's just, that's what's being forfeited. That, the pick-up, the cash. You are getting served with the paperwork for that stuff. |
| Blom: | Oh, well, I'm waiting on em. |
| Agent Schutz: | [provides forfeiture notice and paperwork] |

Govt' Br. 5-6, Dkt. No. 66. The transcribed portion of the interview lasted just over one minute of the three-minute interview. The agents did not interrogate Devin for several minutes as his motion contends. *See* Dkt. No. 40.

At the motions hearing, Agent William Hudson testified as follows regarding his recollection of the custodial interview:

> A. I believe we tried taking a statement from Mr. Blom in the jail but he did not wish to speak without an attorney.
>
> * * *
>
> Q. Okay. And then he effectuated those rights and he elected to remain silent. He said he didn't want to provide a statement; is that correct?
>
> A. I don't recall exactly what he said but it was along those lines.
>
> Q. Okay. And he wasn't further questioned then after that?
>
> A. No.

Tr. 215-16.

4

B.     Conclusions of Law

A person facing custodial interrogation must be informed that, under the Fifth Amendment, "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). Statements obtained during a custodial interrogation without proper warning and waiver of these rights are not admissible against the defendant. *Id.* If a person "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473-74. Interrogation for *Miranda* purposes refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980).

A waiver of *Miranda* rights may be express or implied. *Berghuis v. Thompkins,* 560 U.S. 370, 384 (2010). A waiver may be implied through "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." *Id.* (citation omitted). The Government bears the burden of proving the validity of a *Miranda* waiver by a preponderance of the evidence. *Colorado v. Connelly,* 479 U.S. 157, 168 (1986)

It is undisputed that Devin was in custody and was advised of his *Miranda* rights. Devin contends that Agents Schutz and Hudson violated his Fifth Amendment rights when they asked him questions after he said he did not want to talk to them, specifically, asking about the $71,000 in Michelle's purse. Motion, Dkt. No. 40. The Government concedes that Devin "declined to provide [a] *Mirandized* statement[]" but argues that he then

engaged in a course of conduct amounting to waiver of his right to remain silent by "ask[ing] officers some preliminary questions about the charges against him" and thereafter voluntarily answering their questions. Gov't Br. 5, 7, Dkt. No. 66. The Court disagrees.

Devin said "no" when asked whether he wanted to talk to the agents and thereby invoked his right to remain silent. The only conversation Devin initiated was to ask "What are my charges?" and to engage in a very brief exchange regarding why he was charged with a First Degree offense. This exchange does not imply a waiver for the agents to ask him whether his DNA would be found on the evidence[6] or about the source of, or reason for, the $71,000 cash found on Michelle's person. Those questions specifically relate to the substantive offense, as the Government acknowledges: "[H]e immediately *initiated a conversation about his charge*s. Thereafter, he voluntarily, and without hesitation, *responded to two questions about his offense (regarding his DNA and the cash found on Michelle Blom)*." *Id.* at 7 (emphasis supplied). These are not booking questions, and Devin's responses are not spontaneous utterances. He answered specific questions from Agent Hudson. The Government does not assert that these questions are not interrogation, *i.e.*, reasonably likely to elicit an incriminating response. The fact that, after Devin answered, the agents then "shifted the conversation to routine forfeiture matters" does not change the nature of the direct questions he was asked before the conversation shifted.

---

[6] While it is not clear whether the question "So, your DNA gonna be on there?" refers to the vehicles, the evidence that was found in the vehicles, or both, it does not matter to the analysis here.

6

The Court finds the cases cited by the Government to be distinguishable. In *United States v. Williams* the suspect was advised of her *Miranda* rights, agreed to answer questions, then partway through the interrogation said "I'm done answering questions, I'm sorry, goodbye." 690 F.Supp.2d 829, 834 (D. Minn. 2010). The officer asked, "You're done?" to which she responded, "Yes" but then "without pause, quickly launche[d] into a monologue" and "continue[d] to speak, uninterrupted, explaining her situation and saying that she 'didn't do anything.'" *Id.* at 834, 836. The Court thus found that her desire to remain silent was not clear, consistent, or unequivocal. *Id.* at 836. That is not what happened here. Unlike the suspect in *Williams,* Devin said no, he did not want to talk to the agents. When he spoke after saying "no" it was to ask about the charges against him. After a brief exchange, Devin said "huh" and "okay." He did not launch into a monologue or otherwise initiate discussion; rather, Agent Hudson immediately asked him questions about DNA and the cash in Michelle's purse.

*United States v. Ferrer-Montoya* and *Berghuis* are also dissimilar because they do not involve suspects who clearly said "no" when asked whether they wanted to talk. The suspect in *Ferrer-Montoya* was "not receptive to [the officer's] initial offer to talk about the drugs" but answered basic questions, engaged in routine conversation, and did not clearly say he wanted to remain silent during the 20-minute drive to the highway patrol post. 483 F.3d 565, 569 (8th Cir. 2007). The suspect in *Berghuis* said nothing for two hours and 45 minutes after being advised of his *Miranda* rights and then made a statement. He "did not say that he wanted to remain silent or that he did not want to talk with the police." 560 U.S. at 382.

7

The Government has not carried its burden to show Devin waived his *Miranda* rights through his course of conduct at the interview. Therefore the Court recommends granting his motion to suppress his statement at the Meeker County Jail.

### III.   Devin and Michelle's Motions to Suppress Evidence Obtained as a Result of Search and Seizure

Devin and Michelle move to suppress evidence seized as a result of searches of their residence and vehicles and a search of Michelle's purse on August 12, 2020. Dkt. Nos. 41, 49. They contend the initial warrantless search of their residence was unlawful, there was no reasonable suspicion to conduct the search, and the search warrant obtained later on August 12, 2020 lacked probable cause.

The Government contends that Devin's release conditions and Michelle's probation conditions provided lawful authority for a suspicionless and warrantless search; there was reasonable suspicion for the initial search; and the search warrant was supported by probable cause.

#### A.   Findings of Fact

##### 1.   Devin's Conditions of Release

On February 4, 2020 Devin was released from prison where he was serving a sentence for a drug offenses. Gov't Ex. 1 at 1.[7] Upon release he was under active supervision by the Minnesota Department of Corrections as part of the Challenge Incarceration Program (CIP). *Id.* ("Release Status: CIP Phase II"). He was supervised by a team of four corrections agents, including Christopher Vierzba. Tr. 12-13. His agent of record was Les Gruwell, who performed the assessments on Devin and did the

---

[7] Unless otherwise noted, all exhibit and transcript citations refer to the motions hearing on August 4, 2021. *See* Dkt. Nos. 107 (Hrg. Minutes listing exhibits), 120 (transcript).

8

investigation regarding where he would live upon his release. Tr. 13, 16. Devin was considered a high-risk offender. *Id.* His CIP supervision included meeting with an agent at least three times a week and submitting to regular chemical testing (UA or breath test). Tr. 15.

Devin was subject to Conditions of Release which he signed on January 31, 2020. Gov't Ex. 1 at 1. If he had not signed the document he would not have been granted early release. Tr. 20. The first page of the Conditions of Release states:

> In addition to the general conditions of release listed on back of this document, the releasee shall abide by the following special conditions as approved by the Hearings and Release Unit.

Gov't Ex. 1 at 1. This page lists Special Conditions such as compliance with all requirements of his special supervision under the CIP program, residing at an approved residence and not changing residence without an agent's approval, compliance with chemical dependence programming and aftercare, and refraining from possessing or using mood altering substances or drug paraphernalia. *Id.*

The second page states, in relevant part:

> STANDARD CONDITIONS OF RELEASE
> \* \* \*
>
> 2) The offender must submit to any unannounced visits or searches by the agent/designee of the offender's person, residence, possessions, cell phone, vehicle, or premises. \* \* \*
>
> \* \* \*

*Id.* at 2. Devin was still under these Conditions of Release on August 12, 2020 when the events at issue occurred. His supervised release was set to terminate on August 18, 2026. *Id.* at 1; Tr. 15.

As a result of his supervision of Devin, Agent Vierzba was familiar with Devin's residence and the vehicles he drove, and they were on a first-name basis. Tr. 33, 54-55. Devin was required to report the vehicles he used, and Agent Vierzba had seen Devin driving the black Dodge Ram pickup from which drugs were later seized. Tr. 33.

### 2.     Michelle's Conditions of Probation

On August 5, 2019 Michelle was placed on supervised probation for three years for aiding an offender to avoid arrest, or harboring or concealing. Gov't Ex. 4 (Order & Warrant of Commitment) at 1. The terms of her probation included the following condition:

> Cooperate with the search of your person, residence, vehicle, workplace, property, and things as directed by your probation officer.

*Id.* at 3.  She signed the document setting forth the terms and conditions of her probation. *Id.*

### 3.     Events Leading to the Search

On or about August 12, 2020 Agent Vierzba's team members received a message from fellow agent Chris Salazar, who worked in a different office, that Agent Salazar had searched the phone of one of his clients, *i.e.,* an offender he supervised, and found text messages between the client and a person named "Blom" that Agent Salazar believed was the same Blom, *i.e.,* Devin, that was under supervision by Agent Vierzba's team. Tr. 23-24. The client's text messages included a photo of what appeared to be a large amount of methamphetamine. Tr. 23. Agent Salazar took a photo of his client's phone showing the client's text message with "Blom" that contained the photo of the meth. Tr. 23-24; Gov't Ex. 3 (photo of client's phone). Agent Salazar transmitted his photo of the client's phone to Agent Vierzba's team. Tr. 23-24. Agent Vierzba then talked by phone with Agent Salazar who told him when the client's text messages and meth photo had been

10

exchanged with "Blom" and when Agent Salazar had seen those messages and photo. Tr. 26-27. Agent Vierzba did not recall an exact date but testified it was within a couple of days before August 12, 2020. Tr. 27, 85. Agent Vierzba contacted his supervisor, who authorized a field contact and search of Devin's residence, property, and vehicles in accordance with the Conditions of Release. Tr. 28-30.

Due to what appeared to be a large volume of drugs in the text photo and the fact that no other agents were available, Agent Vierzba contacted the Meeker County Sheriff's Department to speak with someone on the drug task force. Tr. 29. They directed him to Ryan Schutz, whom he had not met before. Tr. 29, 95. Agent Schutz agreed to assist with the search but was in Willmar and unable to get there right away, so Agent Schutz said he would meet him at Devin's residence. Tr. 29, 96. Agent Vierzba also contacted the Litchfield Police Department to ask for officers to assist. Tr. 29-30. The Litchfield officers were to keep watch on Devin during the search. Tr. 30, 35, 58-59.

### 4. Initial Search

Agent Vierzba arrived at Devin's residence with Litchfield Police Officers Ashley Sanquist and Jason Johnson. Tr. 31-32. Agent Vierzba was not wearing a body camera because corrections agents were not issued them. Tr. 55. He told Devin he was there to conduct a search, and Devin let them in. Tr. 31. Agent Vierzba first did a protective sweep of the residence to verify no one else was there. Tr. 60, 86. He then began searching in the west back bedroom and found a key to a Taurus handgun, which raised the possibility there was a handgun in the residence. Tr. 35, 86. For safety reasons he directed the Litchfield officers to put Devin in handcuffs. *Id.*

11

Shortly thereafter Agent Schutz arrived. Tr. 35-36, 97. He was not wearing a body camera because task force members were not issued them. Tr. 112. Agent Vierzba continued to search the north side of the west back bedroom, and Agent Schutz began searching the east side of the bedroom. Tr. 36, 99. Agent Schutz was behind Agent Vierzba. Tr. 37. Agent Schutz found a cloth bag or purse between a dresser and the wall that was empty except for a small dusting of white crystal-like substance inside. Tr. 99-100. He pulled it out and placed it on the bed. Tr. 100. He told Agent Vierzba what he found and that he believed the substance was meth. Tr. 37, 100-01, 171. Agent Vierzba saw him put a large soft-sided purse/handbag on the bed, and Agent Schutz said he was going to get his field test kit. Tr. 37. Agent Schutz left and then returned with his evidence collection bag containing the field test kit and performed a chemical test on the substance. Tr. 38, 101, 172. There was about a dime-sized amount of the substance that Agent Schutz had shaken into a small pile. Tr. 38, 103. Both agents observed that the substance field-tested positive for meth, as indicated by the change in color as the chemical came in contact with the substance. Tr. 38-39, 64, 102. Agent Schutz then put the bag back in the general area where he found it, by the dresser next to the wall, which is his usual practice so that photos can be taken later. Tr. 103-04, 114, 127-28, 173. The agents continued to search and did not immediately inform Devin that meth had been discovered. Tr. 39, 103-04. Agent Vierzba later searched the middle bedroom and found a YETI cup containing some marijuana and a weed pipe. Tr. 39.

Later during the search Agent Vierzba informed Devin that some meth had been found in, by, or on the dresser. Tr. 39-40, 73-74. He could not recall the exact location where it was found because Agent Schutz was the one who found it and Agent Vierzba

12

had been searching a different part of the bedroom. Tr. 39-40, 64, 87. Devin was arrested and taken into custody. Tr. 40, 105. Michelle was not present during the search of the residence. Tr. 106. After the meth was found, Agent Schutz contacted her probation agent, who wanted her placed under arrest for possession of meth. *Id.* When Michelle arrived home, she was arrested. *Id.* An agent searched the purse she was carrying and found approximately $72,000. Tr. 107.

Agent Schutz arranged for Officer Evan Borscheid and his K-9 partner Chase from the Meeker County Sheriff's Department to do a sniff around the three vehicles parked outside the residence (red Dodge Charger, black Dodge Ram pickup, and Ford Explorer), including the one Michelle had arrived in. Tr. 41, 107. The K-9 alerted on the black Ram pickup that Agent Vierzba had observed Devin using in the past. Tr. 41, 108. Agent Schutz obtained a search warrant to search the remainder of the residence and the three vehicles. Tr. 40-42, 104, 110. Agent Vierzba personally searched the black Ram pickup and found THC cartridges, duffel bags with meth, and bags of marijuana. Tr. 42. The agents did not take photos or video of the search as it was happening. Tr. 55-56, 64, 72.

Agent Schutz took photos of the residence with his task force-issued cell phone camera after he had submitted the warrant application, because at that point they were not searching. Tr. 111-112. He first took overall photos of the residence and then took photos of evidence such as the bag by the dresser in which he found the meth. Tr. 112, 176-78; Def. Ex. H. The photo of the meth residue in the bag appears whiter and not crystal-like, as compared to how it looks in person, because of the flash of the phone camera. Tr. 115-16; Def. Ex. H. After he photographed the meth residue, Agent Schutz collected it into a Ziploc bag and marked it with a "1". Tr. 116. He put the Ziploc into

another bag and then finished searching the residence. Tr. 117. He did not participate in searching the vehicles. *Id.*

### 5.     Body Camera Video of Officers Sanquist and Johnson

Officers Sanquist and Johnson of the Litchfield Police Department were present during the initial search of the residence. *See* Incident Rpts of Agent Vierzba, Officer Sanquist, and Officer Johnson, Def. Exs. A, B, and C. They were the only ones wearing body cameras. *See* Def. Ex. M (Sanquist bodycam video) and Ex. N (Johnson bodycam video).[8] The video shows they did not participate in searching the bedroom areas and for the most part they stayed with Devin in the living room or the kitchen, usually standing in one of the doorways. Consequently, their bodycams only occasionally captured footage of the agents conducting their search. Officer Johnson arrested Devin and, later, Officer Sanquist arrested Michelle at the request of the agents conducting the search and drove them to the Meeker County Jail. *See* Johnson and Sanquist Rpts. and Bodycam Video, Def. Exs. B, C, M, and N.

The bodycam video shows that Michelle was not present during the search, arriving home just as Officer Johnson was taking Devin down the stairs from the second-floor apartment to transport him to jail. Johnson Bodycam at 3:46-:47, Def. Ex. N; Sanquist Bodycam at 3:10-:11, Def. Ex. M. Agents intercepted Michelle as she approached the stairs, informing her she was also detained and not free to leave. *Id.* A short time later she too was formally placed under arrest. Sanquist Bodycam at 3:17-:18, Def. Ex. M. She never entered the residence. *Id.* at 3:10-:18.

---

[8] The parties agree that the timestamp on Officer Johnson's bodycam video is about 39 minutes fast. *See* Def. Br. 3 n.7 (39 minutes fast), Dkt. No. 73; Gov't Br. 5 n.5 (35-40 minutes fast), Dkt. No. 83.

### 6. Search Warrant and Application

On April 12, 2020 a Meeker County District Court judge issued a search warrant authorizing the search of the Bloms' residence in Litchfield, Minnesota and three vehicles located at the premises. Gov't Ex. 2. In his application for the warrant, Agent Schutz states he is an officer employed by the Meeker County Sheriff's Office who is assigned full-time with the CEE-VI Drug Task Force investigating controlled substance crimes. *Id.* Earlier that day he was assisting Minnesota Department of Corrections Agent Christopher Vierzba on a compliance check at the residence regarding Devin, who is on supervised release. *Id.* Agent Vierzba supervises Devin. *Id.* Agent Vierzba told Agent Schutz he received information that Devin had sent photos to another individual who is on supervised release, and in the photos Agent Vierzba saw a white crystal-like substance that looked like methamphetamine. *Id.* Agent Schutz also states that the CEE-VI Drug Task Force received information in 2020 that Devin was possibly selling large amounts of methamphetamine. *Id.*

Agent Schutz's warrant application states that he arrived at the residence at 1424 hours and saw Devin sitting on the couch. *Id.* He saw Agent Vierzba was in the west bedroom searching. *Id.* In the west bedroom Agent Schutz saw a "bag/purse" with a white crystal-like substance inside that looked like methamphetamine. *Id.* He saw nothing else in the bag/purse. *Id.* He field tested the substance, which tested positive for the presence of methamphetamine. *Id.*

Agent Schutz learned that Michelle also lived in the residence. *Id.* Michelle arrived home at 1520 hours in a black Ford Explorer. *Id.* A red Dodge Charger and black Ram 1500 were also at the residence. *Id.* All three vehicles are registered to Michelle. *Id.*

Michelle and Devin were arrested and taken to the Meeker County Jail. *Id.* Agent Bill Hudson told Agent Schutz that when Michelle was placed under arrest she asked to put her purse in her vehicle. *Id.* The purse contained a large amount of currency, which Michelle estimated was around $60,000 and said was from casino winnings. *Id.* While in the residence Agent Schutz saw items of high value including computers, TVs, sunglasses, and bags. *Id.* When Agent Vierzba asked Devin about the items, Devin said Michelle had cashed out her 401(k) account. *Id.*

Agent Schutz learned from Deputy Borscheid that his K-9 partner Chase had alerted to the black Ram 1500; showed interest in but did not give a full alert to the red Charger; and did not alert to the Ford Explorer. *Id.*

### B.    Conclusions of Law

The Supreme Court has addressed the lawfulness of searches conducted pursuant to search conditions imposed on parolees and probationers. In general, courts approach Fourth Amendment questions by examining the totality of the circumstances to determine whether a search is reasonable within the meaning of the Fourth Amendment. *Samson v. California*, 547 U.S. 834, 848 (2006). Whether a search is reasonable is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed to promote legitimate governmental interests. *Id.*

Acceptance of a clear and unambiguous search condition significantly diminishes a parolee or probationer's reasonable expectation of privacy. *Id.* at 852 (citing *United*

16

*States v. Knights*, 534 U.S. 112, 122 (2001)).[9] Parole is an established variation on imprisonment of convicted criminals. *Id.* at 850. The essence of parole is release from prison before the completion of a sentence on the condition that the prisoner abide by certain rules. *Id.* States are willing to extend parole only because they are able to condition it upon compliance with certain requirements. *Id.*

In contrast, a State's interests are substantial, because parolees are more likely to commit future criminal offenses and the State has an "overwhelming" interest in supervising them. *Id.* at 853. The Supreme Court "has repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Id.*

In *Knights* the Supreme Court upheld a warrantless search that "was predicated on both the probation search condition and reasonable suspicion." *Id.* at 850. In *Samson* it upheld a warrantless and suspicionless search of a parolee predicated on his status as a parolee under California law, including the plain terms of the parole search condition, finding that under the "totality" of those circumstances the parolee "did not have an expectation of privacy that society would recognize as legitimate." *Id.* at 850, 852.

Here, Devin and Michelle each signed their release and probation conditions, respectively, and there is no basis to conclude they did not know of the explicit search conditions. Agent Vierzba testified that Devin would not have been granted release had

---

[9] *Knights* involved a probationer while *Samson* involved a parolee. The Supreme Court noted that parolees have fewer expectations of privacy than probationers, because "parole is more akin to imprisonment than probation is to imprisonment." *Samson*, 547 U.S. at 850. However, any differences in Devin's status as a parolee and Michelle's status as a probationer are immaterial to the Court's analysis of the circumstances here.

he not signed the Conditions of Release. The search on August 12, 2020 was authorized under the search conditions. But it was also supported by reasonable suspicion, specifically, the information and text photo that Agent Salazar received from his client parolee and sent to Devin's team of corrections agents, including Agent Vierzba. Agent Salazar told Agent Vierzba the text conversation with "Blom" was recent and the photo appeared to be a large quantity of meth. This was sufficient to support a reasonable belief that the person in question was Devin and that evidence of criminal activity would be found at his residence. *See Knights,* 534 U.S. at 121 ("When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests in reasonable."). Thus, the warrantless search of his residence was lawful.

The Court also finds that the search warrant was supported by probable cause. Courts examine the "totality of the circumstances" to determine whether an affidavit provides probable cause to issue a search warrant. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The task of the judge issuing the warrant is "to make a practical, common-sense decision, given all the circumstances set forth in the affidavit," whether there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* A reviewing court's role is "simply to ensure that the [issuing judge] had a substantial basis for concluding that probable cause existed." *Id.* at 238-39 (quotations and citations omitted).

Here, Agent Schutz's warrant application stated that meth had been found in the residence during the initial search on August 12, 2020; CEE-VI Drug Task Force received

information in 2020 that Devin was possibly selling large amounts of meth; a certified K-9 officer had performed a sniff of the vehicles and alerted to one of them; and tens of thousands of dollars had been found in the purse Michelle was carrying when she was arrested. Gov't Ex. 2. The Court concludes that the totality of the circumstances set forth in the application provided a substantial basis for the judge to conclude that probable cause existed to believe that a search of Devin and Michelle's residence, vehicles, and property would uncover evidence of a crime. Accordingly, the Court recommends their motions to suppress evidence be denied.

## RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS THAT:

1. Defendant Michelle Blom's Motion for Suppression of Confessions or Statements in the Nature of Confessions [Dkt. No. 51] be DENIED AS MOOT.

2. Defendant Devin Blom's Motion to Suppress Statements [Dkt. No. 40] be GRANTED.

3. Defendant Michelle Blom's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Dkt. No. 49] be DENIED.

4. Defendant Devin Blom's Motion to Suppress Evidence Obtained as a Result of an Unlawful Search and Seizure [Dkt. No. 41] be DENIED.

Dated: October 22, 2021              __s/David T. Schultz_____
                                     DAVID T. SCHULTZ
                                     U.S. Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).